# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9557 | **DATE** | June 28, 2004 |
| **CASE TITLE** | Patterson et al v. Sheahan et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Defendants' Motions for Summary Judgment (Doc. ## 89, 91, 93, 95, 97, 99, 101, 103, 105, 107, 109, 111, 113)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] . Enter Memorandum Opinion and Order. For the attached reasons, Defendants' motions for summary judgment (Doc. ## 89, 91, 93, 95, 97, 99, 101, 103, 105, 107, 109, 111, 113) as to all counts and all Plaintiffs is GRANTED. Furthermore, counsel for Plaintiffs is directed to show cause by July 19, 2004, why he should not be sanctioned for making statements lacking factual support in the record as detailed in footnotes 6, 9, 13, 18, 20, and 22. Any other pending motion is DENIED as moot.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | 158 |
| | Copy to judge/magistrate judge. | | | |
| | | courtroom deputy's initials | date mailed notice | |
| JHC | | | | |
| | | | mailing deputy initials | |

CLERK, U.S. DISTRICT COURT

2004 JUN 29 PM 7: 37

FILED

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHERYL PATTERSON, JEFFREY ANTONE,      )
SAMUEL SCAIFE, BERNARD LITTLETON,      )
DARLENE JAMES, ROSA PRICE, DEBRA       )
HIGENS, LARRY PARKER, DAVID WALKER,    )
FLOYD BEATTY, SEAN ROBERTS,            )
KEVIN WILLIAMS, and RUBEN HASSAN,      )
                                       )
            Plaintiffs                 )
                                       )      No. 01-C-9557
        v.                             )
                                       )      The Honorable William J. Hibbler
                                       )
THE COUNTY OF COOK, MICHAEL J.         )
SHEAHAN, in his official capacity as Sheriff )
of Cook County, Illinois, RANDY PIETROWSKI, )
in his individual and official capacities,   )
HENRIQUE CAMPILLO, in his individual and )
official capacities, WILLIAM WALLACE,  )
in his individual and official capacities, )
DAVID DEVANE, GREG SHIELDS,            )
THOMAS DOURDY, EDWARD HEALY,           )
ROBERT HELSON, JAMES MALINOWSKI,       )
and MATHEW MCNAMARA,                   )
                                       )
            Defendants.                )



DOCKETED

JUN 2 9 2004

## MEMORANDUM OPINION AND ORDER

A group of fourteen[1] Cook County, Illinois, Sheriff's Department (the Department or Sheriff's

Department) employees sued Sheriff Michael Sheahan and other Sheriff's Department supervisors

and employees, raising a host of claims related to discriminatory practices in the Department.

---

[1] Plaintiff Dennis Micnerski's claims have been severed and thirteen Plaintiffs remain in
this suit.

1

According to the Plaintiffs, Defendants discriminated against the Plaintiffs because of their race, gender, and disabilities in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiffs also raise equal protection claims based on race and gender, 42 U.S.C. § 1983. Next, Plaintiffs claim that the Defendants retaliated against them for opposing discrimination in violation of Title VII and retaliated against them for exercising their First Amendment rights in violation of 42 U.S.C. § 1983. Finally, Plaintiffs raise a trio of claims related to the Department's labor practices, alleging that the Department committed unfair labor practices, 29 U.S.C. § 157, violated the Fair Labor Standards Act (FLSA), 27 U.S.C. § 207, and violated the Family Medical Leave Act (FMLA), 29 U.S.C. § 2615(a)(2). The Court earlier dismissed Plaintiffs' unfair labor practices claims (Count IX). Further, Plaintiffs now concede that summary judgment is proper on counts IV, V, VIII, X, and XI (§ 1983 gender discrimination claims, Title VII gender discrimination claims, ADA claims, FLSA claims, and FMLA claims). Defendants move for summary judgment on Plaintiffs' remaining claims.

I. Factual Background[2]

A.    *Cheryl Patterson*

Cheryl Patterson, an African American female, began working for the Cook County Sheriff's Department in 1982 as a Correctional Officer at the Department of Corrections facility located on

---

[2] It should be noted that the Court's construction of the statement of facts was made extremely difficult by the Plaintiffs' submissions. The Plaintiffs' statement of facts seems to have no organizational pattern. Events are not presented chronologically. Plaintiffs' references to the record are frequently inaccurate. Documents and evidence cited to is not included in the Plaintiffs' summary judgment submissions. And the Plaintiffs muddy their statement of facts by mixing argument and legal conclusions. Defendants move in reply to strike a number of Plaintiffs' statements. Many of Plaintiffs' statements are without foundation and as noted herein Defendants' motion is granted in part.

South California in Chicago, Illinois. (Def. 56.1(a)(3) Statement of Facts ¶ 1 (Def. Patterson Statement)). In 1994, Patterson was assigned to the position of Investigator in the Sheriff's Electronic Monitoring Unit (EMU). (Pl. Joint 56.1(b)(3)(A) Statement of Facts ¶ H-1 (Pl. Statement)). Patterson worked in the Permissions Section of the EMU, where she answered calls from monitored individuals who wanted to leave their homes. (Def. Patterson Statement ¶ 3).

In March 1999, Patterson believed that she was being treated unfairly, and so, along with other employees including Plaintiffs Samuel Scaife, Jeffrey Antone, and Rosa Price, filed a grievance with the Department. (Pl. Statement ¶ H-5; Def. Patterson Statement ¶ 4). According to Patterson and the other grievants, certain EMU employees were allowed to end their shifts early, while others were not. (Def. Patterson Statement Ex. 4). Patterson also complained that the "permission office" was told that if they complained, they "know what's going to happen to [them]." (Def. Patterson Statement Ex. 4). Two weeks after filing the grievance, an anonymous, handwritten note was left on Patterson's desk that read "Bye Bye Inv. Patterson." (Def. Patterson Statement Ex. 6). Patterson notified Chief Randy Pietrowski, informing him of the note and expressing her concern that she was unsure whether the message was a threat to her "life, safety, personal property, or job." (Def. Patterson Statement Ex. 5). Patterson also informed Pietrowski that she had endured verbal taunts and harassment and had discovered other "pieces of derogatory literature" that had been anonymously placed on her desk. (Def. Patterson Statement Ex. 5). The same day, Patterson's colleague (and fellow Plaintiff), Samuel Scaife voiced similar complaints. Scaife had found a note on his desk that read "Your [sic] next Inv. Scaife." (Def. Patterson Ex. 8). Scaife also informed Pietrowski and both Patterson and Scaife requested an internal investigation (Def. Patterson Statement Exs. 5, 7).

3

Pietrowski investigated the complaints by asking Patterson and Scaife to answer several questions.[3] (Def. Patterson Statement Ex. 10). Neither Patterson nor Scaife reported any other harassing behavior in their answers to Pietrowski's questions. (Def. Patterson Statement Ex. 10). Despite the existence of the two notes, Pietrowski concluded on April 19, 1999, that "[t]here is absolutely no evidence that any threats have been made against Investigator's [sic] Patterson and Scaife" and instructed them to report further incidents to their immediate supervisor. (Def. Patterson Statement Ex. 11). Although Pietrowski indicated in his report that he had requested and received reports from all EMU personnel who had access to the Permissions Office on the day in question, his questioning of other EMU personnel was cursory at best. (Pl. Statement Ex. 5a at 19-22).

A month later, Patterson, Scaife, and Vincent Isley (a Caucasian male) were transferred from the Permissions Section to the Patrol Section. The transfer affected Patterson's work schedule, among other things, requiring her to work an irregular schedule instead of a Monday through Friday schedule. Around the time she was transferred, Patterson complained to Deputy Director William Wallace about her perception that Chief Pietrowski provided favorable treatment to white employees, that she had been retaliated against for voicing her complaints, and that promotions were not being given to black employees. (Pl. Statement ¶¶ H-23, H-24). In August 1999, Patterson requested a transfer from the Patrol Section to the Jail Records Section so that she could return to

---

[3] Among other things, Pietrowski asked Patterson and Scaife to explain why they felt the notes were threatening.

a Monday through Friday schedule. (Def. Patterson Statement ¶ 13). In September, Patterson's request to transfer was granted by Wallace. (Def. Patterson Statement ¶ 14).[4]

In November 1999, Patterson and Scaife filed a charge with the Illinois Labor Relations Board.[5] (Pl. Statement H-29). Although the Board found generally for the complainants, it found that Patterson's charge that the Sheriff's Department had retaliated against her for filing grievances was time-barred. (Pl. Statement Ex. 5a). In December 2001, Patterson filed the initial complaint in this matter. (Def. Patterson Statement ¶ 22).

Throughout her tenure at the Sheriff's Department, Patterson consistently received favorable employee evaluations, twice receiving a special commendation or a letter of recognition. (Pl. Statement Ex. 13b-j).

B. *Samuel Scaife*

Samuel Scaife, an African American male, began working for the Sheriff's Department in 1988. (Def. Scaife Statement ¶ 1). In January 1994, he was promoted to the position of supervisor in the Technical Services Section of the EMU. (Def. Scaife Statement ¶¶ 2-3). In 1996, following an injury leave, Scaife was transferred to the Permissions Section. (Def. Scaife Statement ¶ 4). In March 1999, Scaife signed the grievance discussed above, in which members of the Permissions Section complained that they were being treated unfairly because they were not allowed to leave shifts early while other employees in the EMU were allowed to leave early. (Def. Scaife Statement ¶ 5). A few days after signing this grievance, Scaife, like Patterson, found a menacing, anonymous,

---

[4] Patterson had filed a grievance regarding the transfer to the Patrol Section, but withdrew it after her transfer to Records. (Pl. Ex. 5a at 24).

[5] Plaintiffs Jeffrey Antone and Rosa Price joined Patterson and Scaife, but filed their charges in early 2000.

handwritten note in his desk, reading "Your [sic] next Inv. Scaife." (Def. Scaife Statement Ex. 9). And like Patterson, Scaife reported this note, and his belief that it was threatening in nature, to Chief Pietrowski. (Def. Scaife Statement ¶ 8). Two months after the grievance and a month after Pietrowski's cursory investigation, Scaife was transferred from the Permissions Section. (Def. Scaife Statement ¶ 13).

In August 1999, Scaife filed a grievance against the Department because of the involuntary transfer. (Pl. Statement Ex. 16f). Scaife also complained that he had been "[written] up" several times in an effort to harass him because he was a single, African American parent. (Pl. Statement Ex. 16f). On November 4, 1999, the Department ruled on Scaife's grievance, but informed him only that his grievance was "granted." (Pl. Statement Ex. 16k). Eventually, on November 28, 1999, Scaife was transferred to the Jail Records Section, where he could again work a Monday through Friday schedule. (Def. Scaife Statement ¶¶ 19-20).

The record, though not entirely clear, reflects that Scaife received two suspensions late in 1999. In October 1999, Scaife was suspended for three days without pay, allegedly because he was late on September 7, 1999. (Pl. Statement Ex. 16g-h, 16x). Scaife claims to have grieved this suspension (identified by the department as SPAR #99-096), but there is no evidence of his grievance in the record. The record also reveals that Scaife received a 29-day suspension (SPAR #99-106), presumably because he was 3 minutes tardy on October 17, 1999. (Pl. Statement Ex. 16j,16o-p, 16x). In the grievance, Scaife alleged among other things that his timesheets had been changed to reflect the fact that he was late and that an accurate time piece was not used to determine whether employees were tardy. (Pl. Statement Exs. 16j, 16s-u). In response to Scaife's complaint, Deputy Director Michael Ricci instructed supervisors to monitor the clocks in the EMU

to insure that they all displayed the same time. (Pl. Statement Ex. 16l). The record also reveals that on December 3, 1999, the Department denied Scaife's grievance regarding his suspension because he failed to appear at the hearing. (Pl. Statement Ex. 16p). Interestingly, that same day, Deputy Director Ricci informed Wallace that he had "recently completed a review of EMU Investigator Samuel Scaife's disciplinary file" and recommended that "administrative action" be taken against Scaife because he had "demonstrated a clear pattern of rule infractions resulting in a completely unsatisfactory level of job performance." (Pl. Statement Ex. 16n). Ricci, however, did not identify any specific rule infractions. (Pl. Statement Ex. 16n). The record shows that Scaife received 16 violations for tardiness between 1999 and August 2002. (Pl. Statement Ex. 16x). Of these 16 violations, three resulted in one-day suspensions, one in a two-day suspension, one in a 3-day suspension, and only the October 17, 1999 violation resulted in a 29-day suspension. (Pl. Statement Ex. 16x).

In addition to grieving his write-ups for tardiness and the decision to transfer him, Scaife also grieved the Department's failure to post vacancy positions that the officers might bid upon. (Pl. Statement Ex. 16v). According to Scaife, not only did the Department fail to advertise vacancy positions, but also failed to consider him for any promotions because he is African American and because he had complained about discrimination. (Pl. Statement Ex. 19). As a comparator, Scaife points to Matthew McNamara, who was hired by the department in 2002, and who, according to Scaife, has since been twice promoted. (Pl. Statement Ex. 23). McNamara, a friend of Pietrowski, noted on his application that he had not been convicted of any felonies. (Pl. Statement Ex. 23). But according to James Ryan, the Des Plaines, Illinois Chief of Police, McNamara had been charged with the battery of several women and "had been involved in other batteries (including one incident in

which McNamara and another accomplice caused serious bodily injury to the victim) and had falsely represented that he was a member of the Chicago Police Department." (Pl. Statement Ex. 22). Ryan does not specify whether any of these incidents resulted in convictions, and the record contains no record of any convictions.

In November 1999, Scaife filed a charge with the Illinois Labor Relations Board. (Pl. Statement H-29). Although the Board found generally for the complainants, it found that Scaife's charge that the Sheriff's Department had retaliated against her for filing grievances was time-barred. (Pl. Statement Ex. 5a). However, the Board did find that the Department violated Section 10(a)(2) and (1) of the Act by failing to implement Scaife's return to the Permissions Section after his successful grievance in November 2001. (Pl. Statement Ex. 5a). In December 2001, Scaife, like Patterson, filed the initial complaint in this matter. (Def. Patterson Statement ¶ 22).

C.    *Jeffrey Antone*

Jeffrey Antone began working for the Sheriff's Department in 1980. (Def. Antone Statement ¶ 1). In 1989, Antone began working as an Investigator in the EMU. (Def. Antone Statement ¶ 2). Antone signed the March 18, 1999 grievance (protesting the Department's practice of allowing some employee's to leave early), but unlike Patterson and Scaife, does not complain that his participation in that grievance resulted in immediate retaliation against him. (Def. Antone Statement ¶ 3).

In November 1999, the Department issued a memo that altered the schedules of all EMU personnel. (Def. Antone Statement ¶ 4). The Permissions Section and the Work/School Section (where Antone worked) were combined to form the Detainee Movement Management Center (DMMC), and all DMMC personnel were placed on a rotating schedule (such that not every employee worked Monday through Friday). (Def. Antone Statement Ex. 4). Antone (and others

8

including Plaintiff Rosa Price) believed that the redeployment of EMU personnel was taken in retaliation for their March 1999 grievance, and so they filed a grievance (the December 1999 grievance) protesting their change in schedules. (Def. Antone Statement Ex. 6).

Antone later joined Patterson's and Scaife's complaint before the Illinois Labor Relations Board. (Def. Antone Statement ¶ 11). Antone complained that the November 1999 change in his work schedule was made in retaliation for his signing the March 1999 grievance. (Pl. Statement Ex. 6e). After his testimony before the Board, Antone claims that the Department refused to promote him. (Pl. Statement ¶¶ A-10-11).[6]

D.    *Bernard Littleton*

Bernard Littleton, an African American male, also worked in the EMU of the Sheriff's Department, where he worked with Antone in the Work/School Section. (Def. Littleton Statement ¶¶ 1-3). Like Antone, Littleton grieved the November 1999 change in schedules (though he and Plaintiff Darlene James filed their grievances on a form separate from Plaintiff Antone). (Def. Littleton Statement ¶ 8). Unlike Antone, however, Littleton had not signed the March 1999

---

[6] Plaintiff's Statement of Facts Paragraph A-3 claims that "Director Wallace *stated* that because of Antone's testimony before the ILRB he was 'out to get' Antone." (emphasis added). In support, Antone points to his own affidavit, where he claims that he "*was informed* that Director Wallace was 'out to get' [him]." The record evidence cited to does not support Paragraph A-3, which attributes the quote directly to Director Wallace, and not to an unnamed source. Plaintiff's Paragraph A-3 is stricken. Antone also claims in Paragraph A-5 that prior to his testimony to the Board, he was asked on several occasions whether he was interested in supervisory positions. In support he points to his deposition testimony. However, the deposition testimony points to only one, and not *several*, conversation— which, it is clear from the testimony, took place *after* Antone's testimony before the Board. (Pl. Statement Ex. 3a at 151-52). Paragraph A-5 is also stricken. Counsel manipulates and distorts the facts and so the filing is not well grounded in fact, and thus arguably sanctionable under Fed. R. Civ. P. 11. The Court again cautions Plaintiffs' counsel to be more cognizant of the requirements imposed upon him by Fed. R. Civ. P. 11.

grievance discussed earlier. In fact, Littleton has never been disciplined by the Department. (Def. Littleton Statement ¶ 11). Nor has Littleton been denied a promotion since 1984 and he admits that he was never prevented or deterred from applying for a transfer or promotion or denied a promotion because of his race. (Def. Littleton Statement ¶¶ 12-13).[7]

E.     *Darlene James*

Darlene James began working for the Sheriff's Department in 1988 and was assigned to the EMU in 1996. (Def. James Statement ¶¶ 1-2). Although she was aware of Patterson's and Scaife's March 1999 and November 1999 complaints, she did not join them. (Def. James Statement ¶ 9). James was affected by the November 1999 redeployment, but she had filed no grievances and made no complaints prior to or shortly following the redeployment. (Def. James Statement ¶ 9; Pl. Statement ¶E-4, E-5, E-7). Instead, she asked Ricci to transfer her to a unit where she could work

---

[7] Defendants quote extensive portions of Littleton's deposition testimony to support this point. Plaintiff neither admits nor denies the statement and instead answers "objection," arguing that the Defendant's statement does not "elicit an undisputed fact." Local Rule 56.1(b)(3)(A) requires parties to include "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," and do not envision such a response. *See, e.g., Greer v. Board of Educ. of the City of Chicago,* 267 F.3d 723, 727 (7th Cir.2001); *Hall v. Thornton Fractional Township High Sch. Dist. No. 215,* No. 99 C 1433, 2000 WL 1644548, at *5 (N.D.Ill. Oct.24, 2000). As a result any facts that Wilkins improperly purports to controvert are admitted. *McGuire v. United Parcel Serv.,* 152 F.3d 673, 675 (7th Cir.1998). Consequently, the Court deems Defendants' Littleton Statement Paragraphs 12-13 to have been admitted.

Plaintiff responds similarly to other Statements. Those will be deemed admitted as well. Defendants' James Statement Paragraphs 9, 13, and 17 are admitted. Defendants' Price Statement Paragraphs 14-16 are admitted. Defendants' Beatty Statement Paragraphs 12-17 are admitted. Defendants' Hassan Statement Paragraph 8 & 11-12 are also admitted.

Monday through Friday, but according to James Ricci claimed he could not transfer her because of the grievances filed by other Plaintiffs. (Pl. Statement ¶E-5, Ex. 10a).[8]

James later testified at the hearing before the Labor Board in April 2001 about the March 1999 transfers and the November 1999 redeployment. (Pl. Statement ¶ E-7). Shortly after her hearing, James was disciplined for complaining about her assignment during roll call. (Pl. Statement Ex. 10c). Several months later, in September 2001, James failed a department drug test. (Pl. Statement Ex. 10g, 10h). During a November 2001 hearing, James explained that she had mistakenly taken her future son-in-law's prescription medication, which was kept in the same place as her prescription medication. (Pl. Statement Ex. 10h). Nevertheless, because of the Department's zero-tolerance policy, James was terminated. (Def. James Statement ¶ 11; Pl. Statement ¶ E-8). Several months later, James filed a grievance regarding her termination based on her claim that she was not given the Department's zero-tolerance policy, but it was dismissed as untimely. (Pl. Statement Ex. 10m, 10n). Although other employees failed drug tests, only James' violation was sustained. (Pl. Statement Ex. 10k).

F.    *Rosa Price*

Rosa Price, an African American female, began working for the Sheriff's Department in 1980. (Def. Price Statement ¶ 1; Pl. Statement ¶ I-2). In 1993, she began working in the Permissions Section of the EMU. (Def. Price Statement ¶ 3). Like Patterson and Scaife, Price signed the March 1999 grievance protesting the fact that some EMU employees were allowed to

---

[8] James claims that Ricci stated he could not transfer her because of "that [expletive] Patterson," but Plaintiffs cite no factual support for this statement. Consequently Plaintiffs' Statement ¶ E-6 is stricken.

leave their shifts early. (Def. Price Statement ¶ 4). Unlike Patterson and Scaife, Price was not transferred as a result of signing the March 1999 grievance.

In November 1999, Price was redeployed (along with the majority of the members of the EMU) to the Detainee Movement Management Center (DMMC). (Def. Price Statement ¶¶ 6-8). Price then signed Antone's December 1999 grievance, protesting the November 1999 redeployment. (Def. Price Statement ¶ 10). She also submitted a note from her doctor stating that she should be assigned desk work because of her hypertension. (Def. Price Statement ¶ 8). Price later joined the charges filed by Antone before the Labor Board, and testified at the hearing before the board. (Def. Price Statement ¶ 11; Pl. Statement ¶ I-13). Pursuant to the Board's order, Price was returned to a Monday-Friday schedule in 2002. (Def. Price Statement ¶ 12).[9]

After testifying before the Labor Board, Price was reprimanded once for tardiness and once docked one day's pay because she failed to report to work, mistakenly believing she had the day off. (Def. Price Statement ¶ 18; Pl. Statement ¶ I-20). Price also filed a grievance when she was not transferred to the Records Section, claiming that the denial of her transfer request was in retaliation for her participation at the hearings before the Labor Board. (Pl. Statement ¶ I-22). This grievance was denied. (Pl. Statement ¶ I-22).

### G. *Debra Higens*

Debra Higens, a white female, began working for the Sheriff's Department in 1985. (Def. Higens Statement ¶ 1). In October 1999, while she was working in the Technical Services Section

---

[9] Plaintiff denies this statement, arguing that the Department had to be ordered to comply with the award. (Pl. Statement ¶ I-12). In support, the Plaintiff points to the compliance order (Pl. Ex. 5c). But a careful reading of the order shows that the Department failed only in restoring Plaintiff Antone (and not Price) to his prior working hours. (Pl. Ex. 5c). Again, counsel misrepresents and distorts the facts. Defendants' Price Statement Paragraph 12 is therefore deemed admitted.

of the EMU, she had a conflict with her Supervisor, Gregg Shields. (Def. Higens Statement ¶ 10).

Shields claimed that Higens engaged in a profanity-laced tirade. (Def. Higens Statement ¶ 10; Pl.

Statement Ex. 9-d). Higens denied using profanity, but Deputy Chief Campillo investigated the

matter and spoke to Investigators Bednarz, Burgos, and Saulsberry, all of whom confirmed that

Higens did use profanity. (Pl. Statement Ex. 9-d).[10] As a result, Higens was suspended for one day.

(Def. Higens Statement ¶ 12). Higens grieved the suspension, but her grievance was denied. (Def.

Higens Statement ¶ 17).

Higens claims that she was passed over for promotions. (Pl. Statement ¶ 10). The facts

show, however, that Higens *had* been promoted to a supervisory position in the Patrol section of the

EMU, that she *declined* a position of supervisor in the Technical Services Section, and that in 1995

she asked that she no longer be carried at the rank of supervisor. (Def. Higens Statement ¶¶ 4-7).

Higens fails to point to a single position that she sought, but was denied. Higens also claims that she

suffered harassment from coworkers because her deceased husband had been an African American

male and because she had a bi-racial child. For example, Higens claims that an unknown coworker

left a cartoon of a African American male with a vulgar, caption. (Pl. Statement ¶ D-12).[11]

---

[10] Plaintiff objects to Defendants' Higens Statement, Paragraph 10, claiming that the materials relied upon are hearsay and are being offered for the truth of the matter asserted. But the statements are not being offered to prove that Higens did in fact use profanity. Instead, they are being offered to show the effect on the listener—Campillo, who chose to believe Shields and the three investigators who witnessed the incident, and not Higens. In any event, Higens' own documents, specifically Ex. 9-d, confirms that Campillo spoke with the three investigators and they did state that Higens used profanity.

[11] Higens also makes one other claim of harassment. However, counsel has failed to attach the pages of her deposition to which he cites. Consequently, the Court strikes and disregards Pl. Statement ¶ D-13).

Ultimately, in August 2000, Higens resigned her employment with the Sheriff's Department to take a position with the Illinois Department of Corrections and to attend classes at Trinity College. (Def. Higens Statement ¶ 19).[12]

*H.    Larry Parker*

Larry Parker's complaints are vague at best. Parker, an African American male, claims that he was routinely passed over for promotion by less qualified white employees (pointing only to his own self-serving affidavit, which is not based on any personal knowledge). (Pl. Statement ¶ G-12). Parker points to no positions that he actually sought, instead claiming only that there were no applications for any positions (again citing to his affidavit, and those of four other employees). (Pl. Statement ¶ G-4). Despite this contention, Parker admits to bidding on another position or requesting (and receiving) transfer at least two times, both of which were posted. (Def. Parker Statement ¶¶ 2-4).

Parker, like Higens, had an incident with Shields. On October 30, 1999, Shields reported that Parker refused to contact Higens at home on her day off to locate some missing paperwork and that during the course of the conversation Parker used expletives, fell to the floor laughing, and told Shields that he was not going to "deal with this shit" and was going to go home. (Def. Parker Statement ¶¶ 11-14). Parker, like Higens, denied any wrongdoing in the confrontation with Shields. But Campillo, after speaking with Investigators Saulsberry and Williams, concluded that the incident should be forwarded to the internal affairs division. (Def. Parker Statement Ex. 9). Ultimately,

---

[12] Higens denies this statement, pointing to her self-serving affidavit. But her affidavit clearly conflicts with her statements made on her voluntary resignation form. (Def. Higens' Statement Ex. 23). Higens cannot manufacture an issue of fact with self-serving affidavit testimony that conflicts with other statements she made previously. *Cherry v. A T & T, Co.*, 47 F.3d 225 (7th Cir. 1995).

Parker received a one-day suspension. (Def. Parker Statement ¶ 16 & Ex. 9). Parker admits that he has received no other suspension or discipline. (Def. Parker Statement ¶ 18).

## I. David Walker

David Walker began working for the Sheriff's Department in 1991. (Def. Walker Statement ¶ 1). According to Walker, his troubles with the Department began when Higens listed him as a witness in her complaint to the Cook County Commission on Human Rights. (Third Am. Compl. ¶ 177). Shortly thereafter, Walker was suspended for 29 days, for a constellation of violations related to a gun of his ending up in the hands of the Chicago Police Department. (Def. Walker Statement ¶ 9; Ex. 5). Walker claimed initially that the weapon had been stolen from his car on May 1, 2001, and he filed a police report so claiming. (Def. Walker Statement ¶5; Pl. Statement ¶ L-5).[13] But, as it turns out, the weapon, allegedly stolen, had been in the custody of the Chicago Police Department since 1999. (Def. Walker Statement ¶ 6, Ex. 5). At his disciplinary hearing, Walker defended himself by claiming he mistakenly reported the gun as stolen, when in fact a different gun

---

[13] In addition, Walker claims that the Union Steward told him that Wallace would rescind his 29-day suspension if he refused to testify on Higens' behalf. (Pl. Statement ¶ L-5). But the evidence Walker points to, his own deposition testimony, contains only hearsay statements of the Union Steward, and thus not admissible to create a genuine issue of material fact. *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996) (hearsay incapable of creating genuine issue of material fact). Walker further claims in this Paragraph that "Campillo said that he wanted to put his hands up Higens' skirt," again pointing to his deposition testimony. (Pl. Statement ¶ L-5). But the deposition testimony cited to contains no such statement. Walker was asked if he *recalled* the allegations against Campillo, and he responded that "the only thing I recall is the one thing about Deputy Chief Campillo saying he wanted to put his hand under her skirt or something." He did not testify that he actually *heard* Campillo make this statement. This is now the third instance that counsel has grossly misrepresented or distorted the facts in the record. Pursuant to Fed. R. Civ. P. 11(c)(1)(B), counsel is directed to show cause why he should not be sanctioned for making factual contentions that lack evidentiary support as detailed in this footnote and footnotes six and nine. Those portions of Pl. Statement ¶ L-5 relating to Campillo's statements and the alleged deal offered by Wallace are stricken.

had been stolen. (Def. Walker Statement, Ex. 6). Walker claims to have reported his mistake to the police (Pl. Statement ¶ L-5), but he fails to produce a police report demonstrating this, instead pointing only to his affidavit. But Walker's affidavit conflicts with his deposition. At his deposition, Walker claimed both that he never lost the gun (Pl. Ex. 3-L, Walker Dep. at 99) and that the gun had been recovered (though he never produced the alleged missing gun to the Department) (Pl. Ex. 3-L; Walker Dep. at 98). Both statements are not only inconsistent with each other, but also with Walker's statements in his affidavit. There is still more inconsistency to be found in Walker's statements. Walker also claimed (presumably in his grievance regarding the suspension) to have sold the gun in 1993. (Def. Walker Statement, Ex. 5, 6). The Department, however, checked with the State of Illinois and found that no FOID Card had ever been issued to the person Walker allegedly sold the weapon to. (Def. Walker Statement Ex. 5). Walker's 29-day suspension was also in part because the Department learned that he had been working for the Chicago public schools, without completing a Secondary Employment Request Form. (Def. Walker Statement ¶ 8, Ex. 5).[14]

---

[14] Walker denies this fact. However, in support, Walker points only to his affidavit, Paragraphs 13 & 14. (Pl. Ex. 17a). Paragraph 13 does not discuss anything related to his employment with the Chicago Public Schools. Paragraph 14 states only that he "informed" the Department of his employment, not that he completed a Secondary Employment Request Form. Walker further claims that he was not required to carry a gun in his employment with the Chicago Public Schools and therefore he did not have to complete a Secondary Employment Request Form. But in support, Walker points to deposition testimony at Plaintiffs' exhibit 3q. Exhibit 3q purports to be the deposition testimony of William Pellegrini, but no actual testimony is included. Furthermore, Walker's claim that he did not have to complete a Secondary Employment Request Form is contradicted by his own affidavit—which states that he was punished based on "false allegations that I did not report my secondary employment," thus implying that he was so required. (Pl. Ex. 17a at 13). Because the material cited to by Walker in his denial of Def. Walker Statement ¶ 8 does not directly refute the information contained in that paragraph, it is deemed admitted.

In May 2002, Walker was disciplined again, this time receiving a 2-day suspension for failing to indicate why he rejected an inmate for admission to the Electronic Monitoring Program. (Def. Walker Statement ¶ 11).[15] Walker grieved the suspension, but eventually abandoned it.[16] Walker was disciplined again in August 2002. (Def. Walker Statement ¶ 14). This time, Walker was accused of using excessive force against an inmate and refusing to obey the commands of his supervisor. (Def. Walker Statement ¶ 14). Although the Department found that the accusation that Walker used excessive force was not sustained, it did find that he threatened the use of such force and refused to obey a command from Deputy Chief Greg Shields to remove handcuffs from an inmate. (Def. Walker Statement ¶ 15; Ex 9).

Walker encountered more trouble shortly thereafter when Pietrowski noticed that seven complaints that Walker had used excessive force against inmates had been made between 1997 and 2002. (Def. Walker Statement ¶ 16). Although six of the seven were not sustained, Pietrowski noted that the Department might want to consider training for Walker regarding interaction with other, and observed that Walker had been scheduled for three training courses (Cultural Diversity, Defensive Tactics for Patrol, and Civil Liability). (Def. Walker Statement ¶ 17, Ex. 13). Walker wrote a memo, complaining that requiring him to attend training courses during working hours was discriminatory and retaliatory because of his participation in this lawsuit. (Def. Walker Statement

---

[15] Walker denies this statement as well, claiming that investigators were not required to write a memorandum when refusing an inmate for admission into the Electronic Monitoring Statement. But he points to Plaintiffs' Exhibit 17r in support, which clearly states that such an order, though not formally in writing did exist. Wilford Ferguson, testifying in regards to the May 2002 incident, stated that "we are supposed to write a disciplinary report if we have a problem with an inmate and disqualify them [sic] from the program with the reason noted in the memo." Consequently, Defendants' Walker Statement ¶ 11 is deemed admitted.

[16] Walker denies this statement, but points to no evidentiary support in the record for his denial. Therefore, Defendants' Walker Statement ¶ 13 is deemed admitted.

¶ 18). In January 2003, Deputy Chief Tinsley wrote a memo to Chief Pelligrini that Walker's attitude created "officer safety issues as well as problems for the Deputy Chief." (Def. Walker Statement Ex. 18c). According to Tinsley, Walker had "no respect for authority," was not "interested in maintaining a positive attitude" and made comments such as "I hate all white people" and "I hate black people and inmates." (Def. Walker Statement Ex. 18c). Nine months later, Walker was reassigned to be an investigator in the Technical Services Section. (Def. Walker Statement ¶ 22).

J.    *Floyd Beatty*

Floyd Beatty began working for the Sheriff's Department in 1982. (Def. Beatty Statement ¶ 1). Beatty resigned to seek other employment in November 2001. (Def. Beatty Statement ¶ 24).[17] Between May 2001 and November 2001, Beatty was disciplined several times, mostly because he violated the Department's leave policies. Beatty's problems began when, in November 2000, Beatty requested intermittent FMLA leave to help care for his mother. (Def. Beatty Statement ¶¶ 9-10). Beatty admits that he abused the FMLA leave, which was the source of his discipline in 2001. (Def. Beatty Statement ¶¶ 22). In all, Beatty was written up and disciplined 15 times for taking time off that he did not have or failing to report to duty. (Def. Beatty Statement ¶ 20, Ex. 13a-o).[18] Indeed between February 25, 2001 and September 10, 2001, Beatty reported to work on only 18 days. (Def.

---

[17] Beatty "admits" this fact, but then adds that "the exit interviewer marked 'other employment.'" But Beatty signed his voluntary resignation form, and he points to no other facts to dispute Defendants' fact, which is therefore admitted in full.

[18] Beatty claims that the write-ups for being absent were part of a vast conspiracy against him. In support he claims, pointing to his deposition testimony, that Thomas Dourdy told him that he "ha[d] your job in [his] pocket." But the deposition testimony cited to, pages 89-92, contains no such statement. Plaintiffs' Statement Paragraph B-8 is therefore stricken, and counsel is directed to show cause why he should not be sanctioned for violating Fed. R. Civ. P. 11.

Beatty Statement ¶ 23).[19] Further, it came to the Department's attention that despite the fact that Beatty's request to take a second job with the CTA was denied, Beatty nonetheless worked for the CTA. (Def. Beatty Statement ¶ 21). In fact, the Department learned that on several occasions Beatty had reported that he was unable to work because of illness, when in fact he went to his job at the CTA. (Def. Beatty Statement ¶ 21).

*K.    Ruben Hassan*

Ruben Hassan, an African American male, began working for the Sheriff's Department in 1980 and retired in 2002. (Def. Hassan Statement ¶¶ 1, 7). In 1995, Hassan was made a supervisor in the EMU in the Records Section and retained his supervisory position until he retired. (Def. Hassan Statement ¶ 4). In early 2002, the Department asked Hassan to transfer to the Department's administrative offices, but he declined. (Def. Hassan Statement ¶ 6). Shortly thereafter, the Department assigned Hassan's supervisory duties to another African American male, Mr. Logan. (Def. Hassan Statement ¶ 5). Hassan, however, retained his grade and pay. (Pl. Statement Ex. 3c, Hassan Dep., at 77). Hassan was never disciplined while working for the Department. (Def. Hassan Statement ¶ 10). Sometime in 2002, Hassan applied for the Department's Early Retirement Incentive, and in November 2002 he retired, ultimately receiving 78% of his salary. (Def. Hassan Statement ¶¶ 7-8). While employed at the Department, Hassan never complained to any supervisor that he felt he was discriminated against. (Def. Hassan Statement ¶ 12). Nor did he make any complaints to any external agencies or authorities. (Def. Hassan Statement ¶ 12). Despite never complaining while he was employed, Hassan testified at his deposition that he believed that "they

---

[19] Beatty denies this statement, but he denies only the fact that he was in "proof" status, requiring him to submit proof of illness before taking days off. Consequently, the Defendants' proffered fact that Beatty worked only 18 days during this time period is deemed admitted.

were trying to affect [his] job." (Def. Hassan Statement ¶ 12). When asked to specify they, Hassan testified that he "couldn't be specific, just the Administration." (Def. Hassan Statement ¶ 12).[20]

## II. Standard of Review

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts and inferences are viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party opposing summary judgment, however, must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. And neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), is sufficient to defeat such a motion. Further a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition. *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999).

## IV. Analysis

A.      Section 1981, 1983, and Title VII Claims

---

[20] Hassan also claims that he was denied a promotion in 2001 after a specific request by Deputy Chief Zavadin, citing his deposition testimony. (Pl. Statement Ex. 3c at 45-48). But the cited pages support only the fact that Chief Anderson told him that there were going to be some Grade 17 (Hassan was Grade 16) positions available, not that Hassan ever applied for a promotion, or that Zavadin ever requested that he receive (or not receive) a promotion. Counsel is ordered to show cause why he should not be sanctioned for this statement, which lacks factual support in the record.

Eleven Plaintiffs (all but Antone and James) bring claims that the Department discriminated against them because of their race in violation of 42 U.S.C. § 1981 (Counts I). The same eleven also claim that the Department denied them the equal protection of the law because of their race, in violation of 42 U.S.C. § 1983. In addition, Patterson, Price, Scaife, Beatty and Williams also bring race discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e. Section 1981 and Title VII claims are analyzed under the same rubric. *See Alexander v. Wis. Dep't of Health and Human Servs.*, 263 F.3d 673, 681-82 (7th Cir.2001). Under this rubric, a plaintiff may overcome a defendant's summary judgment motion by using either the direct method or the indirect method. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003). Here, Plaintiffs make no argument under the direct method, and proceed only under the familiar burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under the burden-shifting test, Plaintiffs must first establish a *prima facie* case of discrimination by demonstrating that: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was meeting the Department's legitimate expectations; and (4) that the employer treated similarly situated employees who are not in the protected class more favorably. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir.2001). Once the Plaintiffs have established a *prima facie* case, the burden shifts to the Defendants to come forward with a legitimate, non-discriminatory reason for their actions. *Id.* at 886. If the Defendants meet this burden, the burden returns to the Plaintiffs who must show the Defendants' proffered reasons to be pretextual. *Id.*

Section 1983 claims proceed under a similar, but not identical framework. In order to state a *prima facie* case under the Equal Protection Clause of the Fourteenth Amendment, a public employee must demonstrate that she: (1) is a member of a protected class; (2) is otherwise similarly

situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent. *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558, 564

B.   Retaliation Claims under Title VII and 1983

All thirteen Plaintiffs allege that the Defendants retaliated against them for exercising their First Amendment rights in violation of 42 U.S.C. § 1983. In addition, Patterson, Price, Scaife, James and Beatty, also allege that they were retaliated against because they exercised their rights under Title VII. In evaluating a § 1983 claim for retaliation in violation of First Amendment rights in the public employment context, the Court applies a three-step analysis. *See Mt. Healthy City Sch. Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471. First, the employee's speech must be constitutionally protected. *See Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004). Next, the plaintiff must establish that the speech was a substantial or motivating factor in the retaliatory action. *Id.* Finally, the defendant has the opportunity to establish that it would have taken the same action even in the absence of the employee's protected speech. *Id.*

A plaintiff may proceed under either the direct or indirect method to establish a *prima facie* case of retaliation under Title VII. Under the indirect method, the plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Williams v. Waste Management of Ill.*, 361 F.3d 1021, 1031 (7th Cir. 2004). Under the direct method, the employee need only show that she engaged in a statutorily protected activity, that she suffered an adverse employment action, and that the two are

22

causally related. *Id.* Plaintiffs present arguments only under the indirect method on their Title VII retaliation claims.

C.     Timeliness

The Defendants argue that Plaintiffs' § 1981 and § 1983 claims are time-barred, claiming that the statute of limitations for those claims is found by looking to the forum state's statute of limitations for personal injury actions, which is two years. 735 ILCS 5/13-202 Defendants' filed their motion for summary judgment in February 2004. In May 2004, the Supreme Court ruled that if a claim under a federal statute was made possible by a post-1990 enactment, the federal "catch-all" four-year statute of limitatinos applied. *Jones v. R.R. Donnelley & Sons*, — U.S. —, 124 S. Ct. 1836 (May 3, 2004). Defendants admit that, under *Jones*, Plaintiffs' § 1981 claims are not barred by the statute of limitations.

Defendants argue that many of the Plaintiffs' § 1983 claims are barred by the statute of limitations. The Court agrees. Plaintiffs' claims under § 1983 were not made possible by a post-1990 amendment and thus, unlike their § 1981 claims, the Court looks to the forum state's statute of limitations to determine the timeliness of Plaintiff's claims. *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. May 10, 2004) (applying two-year statute of limitations to § 1983 claims). A § 1983 claim accrues when the plaintiff knows or should know that his or her constitutional rights have been violated. *Id.* In this case, Patterson, Littleton, Scaife, Antone, and James filed the initial complaint on December 14, 2001. Patterson, Littleton, Scaife, and Antone, however, fail to point to any evidence that any retaliatory or discriminatory acts occurred *after* December 14, 1999. The latest retaliatory or discriminatory act pointed to by these four Plaintiffs was the November 14, 1999 redeployment. Consequently, their § 1983 equal protection and retaliation claims are barred by the statute of limitations. The § 1983 claims of both Price and Parker are also time-barred. Price

23

complains of incidents that occurred in 1999, but she did not file her complaint until July 2002. Parker complains of about an incident with his supervisor in 1999 and a position that failed to materialize in 1996, but he, like Price, filed his complaint in July 2002, more than two years after the incidents about which he complains.

In addition, Patterson admits that her claims under Title VII are time-barred, and therefore the Court grants Defendants' motion for summary judgment on Patterson's claims under Counts III and VII. Price does not admit that her claims under Title VII are time-barred, but in fact they are. Price filed her EECO claim on February 5, 2002. But the acts about which she complained—primarily the November 14, 1999 redeployment and March 1999 transfer, occurred more than 300 days prior to the filing of that complaint, making her complaint untimely. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 353 (7th Cir. 2002).

In addition to being untimely, the Plaintiffs' § 1983 claims are without merit, as will be discussed below.

D.     Cheryl Patterson

Patterson's § 1981 discrimination claim and § 1983 denial of equal protection claim both fail because she cannot show that she suffered an adverse employment action. Patterson points to three possible adverse employment actions: the May 1999 transfer from the Permissions Section, the November 1999 redeployment, and the Department's failure to offer her a promotion. For an employment decision to rise to the level of a materially adverse employment action, there must be some tangible job consequence. *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 731 (7th Cir. 2004). Courts have found the criteria for materially adverse employment action to be met when: (1) the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) a nominally lateral transfer without a change

in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and when (3) the employee is not moved to a different job or the skill requirements of his present job altered, but the conditions in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment. *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742 (7th Cir.2002).

Neither Patterson's May 1999 transfer, nor the November 1999 redeployment, can be considered materially adverse employment actions. Neither action affected Patterson's compensation or benefits. Neither reduced her career prospects or prevented her from utilizing the skills in which she was trained—she performed substantially the same functions after each transfer. Although her hours changed, the conditions of her job assignment did not change in such a way as to humiliate or degrade her or subject her to an unsafe or significantly negative alteration in her workplace environment. A materially adverse employment action must be "more disruptive than mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993); *see also Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) (lateral transfer which resulted in increased travel time not an adverse employment action); *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 728-29 (7th Cir.2001) (change in shift not an adverse employment action); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883 (7th Cir.1989) (lateral transfer which resulted in increased travel time not an adverse employment action). While Patterson may have preferred the schedule she was on before the transfer and redeployment, "not everything that makes an employee unhappy is an actionable adverse action," otherwise nearly every trivial employment decision would subject an employer to discrimination suits. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996).

Furthermore, even if the May 1999 transfer and November 1999 redeployment could be considered adverse employment actions, Patterson cannot show that similarly situated employees outside the protected class were treated more favorably. In both instances the transfers affected persons outside the protected class. Vincent Isley, a Caucasian male, was transferred along with Patterson in May 1999. And Jeffrey Antone, a Caucasian male *and a Plaintiff in this suit*, was part of the November 1999 redeployment—which affected *everyone* in the Permissions Section and Work/School Section. In light of Antone's participation in this suit, Patterson's (and other the other Plaintiffs') claim that the November 1999 redeployment was an instance of discrimination based upon race is frivolous.

That leaves one potential adverse action—the alleged failure to promote Patterson. It is true that the denial of a promotion can constitute an adverse employment action. *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 555 (7th Cir.2000) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). But Patterson points to no evidence in the record to demonstrate that she ever applied for a promotion. At one point Patterson wrote a memo to James Ryan, the Department's Chief of Operations asking to be considered for several positions "if and when" there were openings, but she never completed a formal application for any position. Patterson claims that she need not point to any specific facts that she sought, and was denied promotions because, according to her, the Department had a "practice" base promotions on the race of the person or personal friendships. The only evidence Patterson points to in support of this supposition is her self-serving affidavit, which is not based on personal knowledge, but instead on her conjecture.[21]

_____

[21] This is true of all the Plaintiffs who offer only conjecture and vague conspiracy theories in their affidavits, not based on personal knowledge. The Plaintiffs fail to point to a single white employee who was promoted without having to apply for the position or who had demonstrably inferior qualifications. Instead, the Plaintiffs present only speculation (coincidentally worded

To establish a *prima facie* case on her § 1983 claim, Patterson must also demonstrate that she suffered an adverse employment action, which she cannot. Furthermore, to pursue her §1983 claim, Patterson must also point to evidence to show that the Defendant acted with discriminatory intent. She has pointed to none. Because Patterson cannot establish a *prima facie* case of discrimination or denial of equal protection because of her race, her § 1981 and § 1983 claim must be denied.

Patterson has one claim remaining: that the Defendants retaliated against her in violation of § 1983 for exercising her First Amendment rights. Defendants argue that they should be granted summary judgment on Patterson's § 1983 retaliation claim because Patterson cannot establish that she suffered an adverse employment action. While the Court agrees that Patterson has not established an adverse employment action, Defendants have misstated the law and Patterson need not demonstrate an adverse employment action to proceed on a § 1983 retaliation claim. A plaintiff pursuing a Title VII retaliation claim must demonstrate she suffered an adverse employment action. *Stone v. City of Indianapolis Pub. Util. Division*, 281 F.3d 640 (7th Cir. 2002). But a Plaintiff pressing a § 1983 claim does not have to point to an adverse employment action because any deprivation that is likely to deter the exercise of free speech is actionable. *Spiegla v. Hull*, No. 03-2480, 2004 WL 1301857, — F. 3d —, at *9 (7th Cir. Jun. 14, 2004); *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). Indeed, the Seventh Circuit has expressly allowed Plaintiffs to press a

---

exactly the same in nearly every affidavit) that the Department had a long standing practice of refusing to consider African American's for promotion. The Plaintiffs' claims that they suffered an adverse employment action because they were not considered for promotions cannot survive based solely on this speculation. Summary judgment is the "put up or shut up" moment in the lawsuit. *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir.2003).

§ 1983 retaliation claim based on an unfavorable change in schedule. *Spiegla*, 2004 WL 1301857 at *9.

Nonetheless Patterson's claims still fail. Patterson must show that she engaged in protected speech, that it was a substantial or motivating factor in the employer's retaliatory action, and if she does, the Defendants must establish that they would have taken the same action regardless of Patterson's speech. Patterson cannot, however, establish that her speech was constitutionally protected. Speech by a government employee relating to ordinary matters of internal operation and lacking connection to any "matter of political, social, or other concern to the community" is not entitled to First Amendment protection. *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Patterson points first to her March 1999 grievance as protected speech. But in that grievance, Patterson (and others) voiced only their private concerns about scheduling. Patterson now claims that the grievance concerns preferential treatment given to white employees. But that argument is belied by the fact that at least one white employee (and a Plaintiff in this suit), Antone, signed the grievance. A close examination of the grievance reveals that the grievants complained only that some people in the office were allowed to leave early, which they believed to be unfair, not that the Department had engaged in any sort of prohibited discrimination.

Patterson also points out that the grievance voiced a concern that the Department supervisors were intimidating employees, threatening retribution if grievances were filed. But in determining whether speech is a matter of public concern, the context in which it arises is important. *Sullivan*, 360 F.3d at 700. If the expression addresses only the private effect on the employee, it should not be considered to touch on a matter of public concern. *Gustafson*, 290 F. 3d at 908. Here, the sole concern of Patterson's grievance is the unfairness that some employees are allowed to leave early. Nowhere in the grievance to the Plaintiffs ask the Department to allow them to file future grievances

28

without fear of repercussions. Accordingly, the Court holds that Patterson's March 1999 grievance did not touch on a matter of public concern and thus is not protected speech.

Even if the Court were to consider Patterson's March 1999 grievance as protected speech, she still could not survive summary judgment. Patterson must also establish that the protected activity was a substantial factor in the Department's retaliatory action. Patterson points out that she was transferred approximately one month after the March 1999 grievance was filed. She was. However, not everyone who filed the grievance was transferred. Rosa Price, Jeffrey Antone, and three other employees who are not plaintiffs in this suit also signed the March 1999 grievance, and none of these five persons were transferred. Furthermore, Vincent Isley, who did not sign the grievance, was transferred along with Patterson. Patterson points to no facts, other than the timing of the transfer, that establish that the March 1999 grievance was a substantial factor in a retaliatory action.

Patterson makes no other argument that she engaged in protected speech (she was not a signatory to the grievance related to the November 1999 redeployment) and therefore cannot establish a *prima facie* case of § 1983 retaliation.

E.     Samuel Scaife

Defendants argue that Scaife, like Patterson, did not suffer an adverse employment action and therefore his § 1981 discrimination claim, his Title VII discrimination claim, and his § 1983 equal protection claim, all of which require him to demonstrate that he suffered an adverse employment action, cannot stand. Defendants focus their entire attention on the May 1999 transfer and the November 1999 redeployment. As explained above, those actions are not adverse employment actions. But Defendants ignore other facts placed in the record by Scaife. Particularly, the pattern of suspensions he suffered in late 1999, which he began to receive after filing grievances. Indeed,

when Scaife was three minutes tardy on October 17, 1999, he was suspended for 29 days. *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 729 (7th Cir. 2004) (suspension of 22 days an adverse employment action). Thus it is clear that Scaife did suffer an adverse employment action. The problem, however, is that Scaife argues himself out of court. Scaife argues that the suspensions that he suffered were because he filed grievances, not because he was African American. (Pl. Resp. to Def. Summ. J. at *).[22] The essence of Scaife's § 1981 and Title VII discrimination claims as well as his § 1983 equal protection claim is that the employer takes the adverse action *because of* the his membership in a protected class. Here, Scaife has admitted that his race had nothing to do with the adverse employment action imposed upon him, but instead those actions were taken because he filed grievances relating to the employer's practices. Hence, his § 1981 discrimination, Title VII discrimination, and § 1983 equal protection claims must fail.

Furthermore, even if the Court were to proceed with the *prima facie* case, Scaife could not establish either that he was meeting his employer's legitimate expectations or that similarly situated white employees were treated more favorably. In all Scaife was written up 16 times in a three-year period for tardiness. He points to no white employee who had a similar history of tardiness who

---

[22] The Court cannot identify the page number in Plaintiffs' brief where Scaife presents this argument because the Plaintiffs failed to number their brief. Later on the page Scaife makes a conclusory statement that he was "disciplined for reasons that white employees on his shift and performing the same duties were not similarly disciplined. SOF 28. Black employees . . . were disciplined harshly for similar incidents in which white employees were not disciplined. SOF 29. But Scaife never identifies either (1) for what "reasons" or "incidents" the discipline was imposed; or (2) specifically which white employees received favorable treatment. Scaife's reference to SOF 28 & 29 points the Court to his deposition testimony. But the cited portions of that testimony (at least those that the Plaintiffs managed to include) do not even remotely touch upon the discipline (or lack thereof) imposed on white employees. Accordingly, those paragraphs are stricken and counsel is directed to show cause why he should not be sanctioned for making assertions that lack factual support in the record.

received more favorable treatment. Thus his argument that white employees were treated more favorably is mere speculation.

Scaife's § 1983 retaliation claim and Title VII retaliation claim also fail. Scaife's retaliation claims fail for the same reason that Patterson's claim fails: he cannot establish that he engaged in a statutorily protected activity. He signed the March 1999 grievance that Patterson signed. But as noted earlier, that grievance concerned only the private scheduling concerns of the employees, and cannot be considered to be a comment on a matter of public concern. Scaife filed additional grievances: in August 1999 he filed a grievance in which he protested the change in his schedule. Scaife makes passing reference to being discriminated against because he is a single African American parent, but elaborates no further. The primary focus of his grievance is a request to restore him back to a Monday-Friday schedule. This grievance, like the March 1999 grievance, concerns Scaife's private concerns regarding his schedule and does not touch upon a matter of public concern. Scaife filed multiple grievances after being disciplined by the Department for tardiness, but like Scaife's other grievances, these concern a purely private matter—Scaife sought to have his discipline expunged because he believed his timesheets had been altered and that the Department was not using an accurate timepiece. None of Scaife's grievances raise a matter of public concern, and therefore cannot serve as statutorily protected activities.

Furthermore, even if the August 1999 grievance could be viewed as a statutorily protected expression, Scaife cannot show that the Department retaliated against him. To the contrary, it *granted* his grievance and ultimately restored him to the time-schedule that he had requested in the grievance. Because Scaife cannot demonstrate that he engaged in a statutorily protected activity, his § 1983 retaliation claim and Title VII retaliation claim must fail.

      F.     Jeffrey Antone

Jeffrey Antone's has but one claim: that the Department retaliated against him in violation of § 1983 when it redeployed him in November 1999. Defendants are entitled to summary judgment on Antone's claim as well. In order to establish a § 1983 retaliation claim, Antone must demonstrate that he engaged in a statutorily protected activity. Antone points to the March 1999 grievance that he signed, along with Patterson and Scaife, as a statutorily protected expression. But the March 1999 grievance raised only private concerns. Speech is not directed at a matter of public concern if it merely addresses a personal grievance of interest only to the employee. *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002). As noted earlier, the March 1999 grievance addressed only the employees' unhappiness with the Department's policies regarding leaving shifts early. It made no charges of discrimination or corruption. Furthermore, even if the March 1999 grievance could be viewed as touching upon a matter of public concern, Antone could not establish the second element of a § 1983 retaliation claim: that the speech was a substantial or motivating factor in the retaliatory action. The November 1999 redeployment occurred nearly 8 months after the March 1999 grievance. Absent other suspicious circumstances, a gap of eight months is too long to suggest any connection between the two events. *Clark v. County Sch. Dist. V. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508 (2001) (twenty months too long, citing cases where three or four months was too long); *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (six weeks too long).

And the November 1999 redeployment affected personnel who never signed the March 1999 grievance—the entire unit was redeployed. Antone points to no facts whatsoever to establish even the flimsiest of links between the March 1999 grievance and the November 1999 redeployment. His § 1983 retaliation claim must fail.

G.    Bernard Littleton

Littleton's claims border on frivolous. Like Antone, Littleton claims that the November 1999 deployment was retaliatory. But Littleton never signed the March 1999 grievance and makes no effort to point to any fact to establish that he engaged in statutorily protected activity. Littleton also raises a § 1981 discrimination claim and a § 1983 equal protection claim. But nowhere does Littleton make even the slightest effort to point to an adverse employment action. Littleton only makes vague allegations regarding promotions. But he points to no specific, articulable facts to demonstrate that white employees who were promoted without having to apply for the position or who had demonstrably inferior qualifications. Instead, he offers only his own speculation and an affidavit, not based on personal knowledge, that word-for-word reads the same as the affidavits filed by nearly every plaintiff in this suit. This speculation is insufficient to stave off summary judgment and Littleton's claims fail.

H.    Darlene James

Darlene James' claims also border on frivolous. James, like Littleton, claims that the November 1999 redeployment was retaliation for her participation in statutorily protected activity. But like Littleton, James never signed the March 1999 grievance, and so the November 1999 redeployment cannot be retaliatory, unless James points to some other expression, which she does not. James also claims that she was targeted for termination because she testified before the Labor Board in April 2001. The Defendant admits that James' testimony before the Labor Board qualifies as a statutorily protected activity. But James was not terminated until November 2001, after she failed a drug test. In order to establish a § 1983 retaliation claim, James must put facts in the record to demonstrate that her speech was a substantial or motivating factor in the retaliatory action. And as noted earlier, in order for temporal proximity to establish an inference of causality the retaliatory must be "very close" in time to the protected activity. *Clark County Sch. Dist.*, 532 U.S. at 273-74.

33

She has pointed to no such facts, and the timing of her termination is not even remotely suspicious. Furthermore, the Defendant has entered facts into the record—the fact that James failed a drug test—to establish that it would have taken the action even in the absence of James' protected speech. James has offered no facts to show that Defendants' reason for terminating her were pretextual in any way. Although James claims she inadvertently took her son's prescription medication, the Department had a no tolerance drug policy and it is not the Court's position to pass judgment on the wisdom of the employer's policies. The Court does not sit as a super-personnel department. *See Foster v. Arthur Anderson, LLP.*, 168 F.3d 1029, 1035 (7th 1999) (refusing to question a termination pursuant to a policy requiring employees to notify the employer if they would be late). Rather than quibble with the wisdom of the Department's zero tolerance policy, James must instead demonstrate that there is a dispute about whether the employer would have fired her because of the failed drug test in the absence of her testimony before the Labor Board. She has not done so. Her grievance filed in protest of the termination is telling in that respect. Indeed, when she grieved the termination (which incidentally was denied as untimely), she argued only that she had not been given a copy of the zero-tolerance policy, not that she had been retaliated against. Further, she points to no other employee who failed a drug test who was not terminated. James points to no facts to refute that the Defendant terminated her because she failed the drug test. Her § 1983 retaliation claim and Title VII retaliation claim fail.

I.     Rosa Price

Rosa Price's claims also fail. With regard to her § 1981 and Title VII discrimination claims, as well as her § 1983 equal protection (race) claim, Price cannot establish that she suffered an adverse employment action. Price, like Patterson and Scaife, points to the May 1999 transfer and November 1999 redeployment as adverse employment actions. But neither the May 1999 transfer

nor November 1999 redeployment could be considered to rise to the level of an adverse employment action. Furthermore, as pointed out earlier, the November 1999 redeployment cannot serve as the basis for a discrimination claim because it affected *all* employees within the department, and not just those in the protected class—indeed, Antone and James, both Plaintiffs in this suit and not in the protected class, were affected by the November 1999 redeployment. Price cannot establish a *prima facie* case of discrimination under § 1981 or Title VII. Nor can she establish that she was denied equal protection of the laws because of her race, in violation of § 1983.

Similarly, Price's retaliation claims, under Title VII and § 1983, cannot survive the Defendants' summary judgment motions because Price cannot establish that she engaged in a statutorily protected activity. Price points to no statutorily protected activity other than her participation in the March 1999 and December 1999 grievances. As discussed earlier, neither grievance touches upon a matter of public concern, and cannot be considered as statutorily protected activities.

There is yet another reason why Price's Title VII discrimination and retaliation claims fail. A plaintiff is barred from raising a Title VII claim that is absent from her EEOC charge, unless the claim is reasonably related to her EEOC charge. *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999). Price's EEOC complaint complains only of disability discrimination and failure to accommodate. Price cannot now add to her EEOC complaint claims that are independent of those she initially raised.

J.    Debra Higens

Higens' claims arise from a different set of facts than those of the previous six Plaintiffs, but nevertheless they also fail. Higens clams that she was discriminated against because she had been married to a African American male. To support her claim, she alleges that she suffered an adverse

35

employment action when she was disciplined for one-day following a shouting match with her supervisor. Defendants argue that a one-day suspension does not significantly alter her job responsibilities or benefits and cannot be an adverse employment action. *But see Sonnleitner v. York*, 304 F.3d 704, 713 (7th Cir. 2002) (listing suspension as an adverse employment action); *Lucas*, 367 F.3d at 729 (suspension fo 22 days an adverse employment action). But the Court need not decide whether Higens' one-day suspension was an adverse employment action because she cannot point to similarly situated employees who were treated more favorably. Higens points to no one, who was accused of using profanity to her supervisor, who did not face similar discipline. Furthermore, the Department offered a legitimate, non-discriminatory reason for its action—that Higens used profanity towards her supervisor. Higens points to no evidence to demonstrate that this reason was pretextual. Higens denies that she engaged in the behavior for which she was disciplined. But Higens' dispute does not create an issue of material fact, because the question for the Court is not whether she actually made the statements, but whether the decision maker honestly believed that she did. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir.1997). The Department (and even Higens herself) offered evidence that three of her co-workers confirmed her supervisor's version of the story. Higens has offered no evidence to place in question the fact that the employer honestly believed Higens had shouted and swore at her supervisor.

Higens also claims that a coworker left a sexual-explicit, vulgar cartoon at her desk. It is not clear whether Higens is attempting to raise a hostile work environment claim or whether she believes this single instance is sufficiently severe to be considered an adverse employment action. But to show that the work environment is hostile, a plaintiff must show that the alleged harassment was so severe and pervasive as to create an objectively intolerable or abusive working environment. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir.1994)). The isolated, albeit vulgar, incident

described by Higens simply does not rise to the level required to form an objectively hostile work environment, and it certainly does not alter the terms and conditions of her employment and cannot be considered an adverse employment action.

Although Higens raises a § 1983 retaliation claim in the Complaint, she makes no argument regarding this claim on the motion for summary judgment. The Defendant has pointed out that Higens offers no facts to show that she engaged in statutorily protected activity or that she the Department retaliated against her because of that activity and her retaliation claim is without merit.

K.     Larry Parker

Parker's complaints merit little discussion. As noted earlier, his § 1983 claims, like those of most other Plaintiffs, are time barred. Parker, like Higens, also had a confrontation with his supervisor that resulted in a one-day suspension. Like Higens, he grieved the suspension. And just as in Higens' case, the decision maker chose to credit the witnesses who confirmed his supervisor's allegation that Parker had engaged in improper behavior. Parker offers no facts to cast doubt on the honesty of the decision maker's conclusion. Parker points to no other discriminatory act—other than speculative comments that he was passed over for promotions. The Defendants are entitled to summary judgment on Parker's claims as well.

L.     David Walker

Walker rests his § 1981 discrimination and § 1983 equal protection claims on two suspensions that he was given in 2002, one two days in length, the other, fifteen. Walker received the first suspension when he failed to write a memo explaining why he rejected an inmate for admission into the Electronic Monitoring Program and the second when he threatened an inmate with physical harm and then failed to remove the handcuffs from an inmate despite being directed to do so by his supervisor. Putting aside, for the moment, the questions of whether Walker was

meeting his employer's legitimate expectations and whether the suspensions qualify as adverse employment actions, Walker's claims still cannot survive Defendants' summary judgment motion. Walker cannot point to any other similarly situated employees who were treated more favorably.

Walker points to "Investigator Maloney" as another person who failed to write a memo explaining why he rejected an inmate from the Program. But according to Walker's own deposition testimony, Maloney was not an "Investigator," but a *Supervisor*. (Walker Dep., Pl. Ex. 3-L at 85). To prove that a fellow employee is "similarly situated," an employee must offer evidence about a "comparable" employee, or someone who "is similarly situated with respect to performance, qualifications and conduct." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir.2002). Walker was not a Supervisor, he was a Grade-16 Investigator. (Def. Walker Statement, Ex. 2). Hence, Maloney and Walker are not similarly situated. Walker points to no other *investigators* who failed to write a memorandum explaining why they rejected an inmate for admission into the Electronic Monitoring Program who were not disciplined.

Similarly, Walker suggests that "Investigators Maloney and Ratkovitch" failed to remove handcuffs from inmates, but were not disciplined. As noted above, Maloney was a supervisor, not an investigator and so is not similarly situated. And at his deposition, Walker testified only that Ratkovitch "handcuffed people every day" and wasn't disciplined. But Walker was not disciplined for "handcuffing" an inmate, he was disciplined for failing to remove handcuffs despite orders from his supervisor that he do so and for threatening an inmate with physical harm. In order to show that a similarly situated employee was treated more favorably, they must have engaged in the same conduct. *Id.* Here Ratkovitch and Walker did not, and thus are not similarly situated.

Finally, Walker claims that his supervisors made "false allegations" relating to the 15-day suspension. But Walker offers nothing other than his own speculation that their testimony was false.

38

In any event, Walker had the opportunity to demonstrate that their allegations were false, but the decision maker, in this case the Department's Legal Advisor Joseph Consolo, believed Walker's supervisors, whose allegations were corroborated not only by the detainee's complaint but also by "independent evidence." (Def. Walker Statement Ex. 10). Indeed, Walker had a lengthy history of excessive force complaints lodged against him. He cannot defeat summary judgment with conclusory assertions of discrimination. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2002) (Plaintiff cannot defeat Defendant's summary judgment motion by speculating about Defendant's state of mind); *Jordan v. Summers*, 205 F.3d 337, 343-44 (7th Cir.2000) (party's own speculation cannot defeat summary judgment); *Borcky v. Maytag Corp.*, 248 F.3d 691, 697 (7th Cir. 2001) (plaintiff must come forward with some evidence beyond her own surmises, to show that employer has treated similarly situated employees more favorably). Because Walker cannot show that similarly situated employees were treated more favorably, his § 1981 and § 1983 claims fail.

Walker's § 1983 retaliation claim also fails. He claims that the Department retaliated against him for filing grievances in response to the discipline imposed upon him. But these grievances touched on only matters related to Walker's private concerns—that he should not have been disciplined—and they therefore cannot form the basis of a retaliation claim.

K.    Floyd Beatty

Like many of the Plaintiffs' claims, Beatty's claims border on frivolous. During a six-month period, Beatty reported to work only 18 days. He admits that during this period he abused FMLA leave and that he claimed to have taken to help his mother but instead had taken so that he could work a second job. Ultimately, Beatty resigned his position in November 2001 to seek other employment. Beatty was disciplined 15 times for failing to report to duty. The Department clearly did not believe that he was meeting their legitimate expectations. *Contreras v. Suncast Corp.*, 237

F.3d 756, 761 (7th Cir. 2001) (employee who violated attendance policies eight times not meeting legitimate expectations). Beatty's spotty attendance, by itself, is sufficient reason to deny his claim. But furthermore, Beatty makes no attempt to locate an employee with a similar history of absenteeism who was treated more favorably. He makes vague allegations that "white employees" were not punished as harshly as he was, but points to no one specifically.

Beatty also makes vague allegations of a vast conspiracy by Department brass who were determined to strip him of his sick-leave time so that they could then suspend him for using sick leave that they had stealthily taken away without his notice. He points to not even a scintilla of evidence to support this theory, which borders on the preposterous. *See Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) (plaintiff cannot establish conspiracy theory with pure speculation); *Murray v. Chicago Transit Authority*, 252 F.3d 880, 888 (7th Cir. 2001) (same). Beatty's Title VII and § 1981 employment discrimination claims as well as his § 1983 equal protection claims thus fail.

Finally, Beatty claims the Department retaliated against him. But his claims are so conclusory that they warrant little discussion. He makes vague allegations that he was retaliated for "speaking up and complaining about union violations." But he points to no specific statements that he made. In the absence of any statutorily protected activity, Beatty's § 1983 retaliation claims also fail.

L.    Ruben Hassan

Hassan's claims are without merit and also close to frivolous. Hassan's only gripe is that he was passed over for promotion. But although the Plaintiffs include a section of facts related to Hassan, his name is mentioned only twice in the argument section of the Plaintiffs' brief. First, in a short paragraph, Hassan claims to have been meeting his employers' legitimate expectations. Second, Hassan is mentioned only in passing as having been passed over for promotions. Like the

other Plaintiffs, Hassan fails to specify precisely which promotions he desired, pointing only to his own self-assessment that he was qualified to be promoted and his own affidavit, not based on personal knowledge, that the Department had a practice of promoting lesser-qualified white employees instead of African American employees. Such vague speculation cannot stave off summary judgment.

M.    Sean Roberts and Kevin Williams

Although Defendants move for summary judgment on Roberts' and Williams' claims, Plaintiffs have chosen not to respond. The Court concludes that Roberts and Williams have abandoned their claims. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003).

### V. Conclusion

For the most part, Plaintiffs' claims rest on rampant speculation and self-assessments of their own ability. In short, the Plaintiffs have largely turned their dissatisfaction with the restructuring of the Department in November 1999 into a colossal, 13-Plaintiff employment discrimination suit. The suit is like a snowball careening out of control down the side of a mountain, picking up Plaintiffs as it tumbles, each harboring seemingly more frivolous claims than the last. For the reasons stated above, Defendants' motion for summary judgment as to all counts and all Plaintiffs is GRANTED. Furthermore, counsel for Plaintiffs is directed to show cause by July 19, 2004, why he should not be sanctioned for making statements lacking factual support in the record as detailed in footnotes 6, 9, 13, 18, 20, and 22.

IT IS SO ORDERED.


_6/28/04_
Dated

_Wm. J. Hibbler_
The Honorable William J. Hibbler
United States District Court